New England Tractor-Trailer Training of Connecticut, Inc. *v.* Globe Newspaper Co.

NEW ENGLAND TRACTOR-TRAILER TRAINING OF
CONNECTICUT, INC. *vs.* GLOBE NEWSPAPER COMPANY.

Suffolk. December 5, 1984. — July 24, 1985.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, LYNCH, & O'CONNOR, JJ.

*Libel and Slander. Constitutional Law,* Libel and slander. *Practice, Civil,*
Summary judgment.

The plaintiff in a libel action may prove that an allegedly defamatory state-
ment was made of and concerning the plaintiff by establishing that the
statement could reasonably be understood as referring to the plaintiff
and that the defendant was negligent in publishing it, and is not required
to show, as held in *Hanson* v. *Globe Newspaper Co.,* 159 Mass. 293
(1893), that the defendant actually intended to refer to the plaintiff.
[474-480]
In a libel action by New England Tractor-Trailer Training of Connecticut,
Inc., and New England Tractor-Trailer Training of Mass., Inc., against
the Globe Newspaper Company arising from the publication of a series
of articles referring to "New England Tractor-Trailer School," the judge
erred in granting the defendant's motion for summary judgment against
New England Tractor-Trailer Training of Connecticut, Inc., on the
ground that the articles were not published of or concerning this plaintiff,
where there were unresolved questions of fact as to whether the defendant
intended to refer to the Connecticut corporation in the articles, or whether,
if it did not so intend, it was negligent in publishing articles which could
reasonably be understood to refer to the Connecticut corporation.
[480-483]

CIVIL ACTION commenced in the Superior Court on March
25, 1977.

The case was heard by *Peter F. Brady,* J., on a motion for
summary judgment.

After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.

*Mack M. Roberts* for the plaintiff.

*James F. McHugh* for the defendant.

LIACOS, J. The plaintiff, New England Tractor-Trailer Training of Connecticut, Inc. (NETTT-Conn), and New England Tractor-Trailer Training of Mass., Inc. (NETTT-Mass), sued the Globe Newspaper Company (Globe) alleging that a series of articles published by the Globe on career training schools defamed NETTT-Mass and NETTT-Conn. The complaint was in two counts. Count one alleged defamation of NETTT-Mass, and count two alleged defamation of NETTT-Conn. The Globe filed a motion for summary judgment on count two and on part of count one. Both parties filed affidavits. A judge of the Superior Court in Suffolk County granted the Globe's motion. Subsequently, NETTT-Mass and the Globe stipulated to the dismissal with prejudice of count one of the complaint. NETTT-Conn appealed the allowance of summary judgment on count two. The Appeals Court reversed. 18 Mass. App. Ct. 906 (1984). We granted the Globe's application for further appellate review. We reverse the trial judge's entry of summary judgment for the Globe on count two.

The record reveals the following facts. Commencing on March 25, 1974, the Globe published a series of articles pertaining to the private vocational industry. NETTT-Conn claimed in its complaint that it was defamed by six of the articles in the series. The first article, published in the morning edition of the Globe on March 25, 1974, announced the Globe's investigation into private vocational schools and named no particular schools or types of schools. The second article, published in the evening edition of the Globe on March 25, 1974, and in the morning edition of the Globe on March 26, 1974, described the Globe's investigation in more detail and focused on a particular training school, ITT Tech. The third article, published on March 27, 1974, was entitled, "Home-study schools: Con game or wave of the future?", and again contained generalized comments about the private vocational training industry. It was complemented by four separate articles, also published in the same March 27, 1974, edition, describing four separate schools, none of which was NETTT-Conn.

On March 29, 1974, the Globe published a set of articles on the private vocational training industry including one entitled, "Dead-end trip on rattletrap trucks." This article described

the "New England Tractor-Trailer School" and quoted Arlan Greenberg, who was described as "N.E. Tractor president." The school was referred to variously as "New England Tractor-Trailer School," "New England," "N.E. Tractor Trailer," and "N.E. Tractor." This article was highly critical of "New England Tractor-Trailer School." It stated, inter alia, that several instructors at the school had been teaching without required certificates; that the trucks were "run-down," "decrepit, sometimes unsafe"; that Arlan Greenberg, "N.E. Tractor president," "made a number of demonstrably false statements and misrepresentations about the school"; and that the school's contracts with its students "violate[d] the laws of at least two states." The last two articles, published on April 12, 1974, and June 6, 1974,[1] referred to "New England Tractor-Trailer School," and concerned investigations of the school by the Massachusetts Registry of Motor Vehicles, the office of the Attorney General of Massachusetts, and the New Hampshire Attorney General's Consumer Protection Division. These last two articles repeated many of the critical statements about "New England Tractor-Trailer School" which were contained in the March 29, 1974, article.

The plaintiff claims that it was defamed by these articles. The defendant, Globe, argues that the articles did not defame the plaintiff because they were not written "of and concerning" the plaintiff. *Hanson* v. *Globe Newspaper Co.,* 159 Mass. 293, 294 (1893). The Globe argues that the articles published on March 25, 26, and 27, 1974, contained only generalized statements about the private vocational training industry or referred to particular schools, none of which was, or could be confused with, NETTT-Conn. The Globe further argues that the articles published on March 29, April 12, and June 6, 1974, concerned NETTT-Mass exclusively and were not of and concerning NETTT-Conn. The plaintiff contests the Globe's assertions. It argues that while NETTT-Conn and NETTT-Mass are distinct corporations (the former incorporated

---

[1] The June 6, 1974, article was published in substantially the same form in both the morning and evening editions of the Globe.

under the laws of Connecticut, the latter under the laws of Massachusetts), they hold themselves out to be one school with two locations. The plaintiff argues that there is a genuine issue of material fact, i.e., whether the articles were of and concerning NETTT-Conn, and that summary judgment should not have been granted for the Globe. Mass. R. Civ. P. 56 (c), 365 Mass. 824 (1974).

It is a fundamental principle of the law of defamation that a plaintiff must show, inter alia, that the allegedly defamatory words published by a defendant were of and concerning the plaintiff. *New York Times Co.* v. *Sullivan,* 376 U.S. 254, 288, 292 (1964). See *Geisler* v. *Petrocelli,* 616 F.2d 636, 639 (2d Cir. 1980); *Fetler* v. *Houghton Mifflin Co.,* 364 F.2d 650, 651 (2d Cir. 1966); Restatement (Second) of Torts § 613 (1977). This requirement is described at length in *Hanson* v. *Globe Newspaper Co., supra,* ("In a suit for libel or slander, it is always necessary for the plaintiff to allege and prove that the words were spoken or written of and concerning the plaintiff"). The Globe argues that, since an affidavit of the author of these articles shows, without contradiction, that there was no subjective intent to defame NETTT-Conn, it must prevail as matter of law. The Globe relies primarily on *Hanson* to sustain its position.

It is true that in *Hanson* v. *Globe Newspaper Co., supra,* the majority opinion adopted essentially a subjective test for the determination whether a defendant's words are of and concerning the plaintiff.[2] The court stated, "The defendant's mean-

---

[2] In *Hanson,* the defendant newspaper published an article about the criminal activity of someone it identified as "H.P. Hanson, a real estate and insurance broker of South Boston." *Id.* at 294. The newspaper apparently intended to describe one "A.P.H. Hanson" who was a real estate and insurance broker of South Boston and who had been assessed a criminal fine. However, the plaintiff in *Hanson* was another man whose name actually was H.P. Hanson, and who was also a real estate and insurance broker of South Boston. The plaintiff sued for libel because the allegations of criminal activity were defamatory and untrue as to him. A judge of the Superior Court "found as a fact that the alleged libel declared on by the plaintiff was not published by the defendant of or concerning the plaintiff." *Id.* This court found that the evidence warranted that finding and that judgment for the defendant newspaper was warranted. *Id.* at 299.

ing in regard both to the person to whom the words should be applied and the imputations against him is always to be ascertained." *Id.* at 294-295. The central inquiry was aimed at discovering the subjective intent of the defendant because "[d]efamatory language is harmful only as it purports to be the expression of the thought of him who uses it," *id.* at 295, and the defendant's "meaning, to be ascertained in a proper way, is what gives character to his act, and makes it innocent or wrongful," *id.* at 296. Thus, "all the questions relate back to the ascertainment of [the defendant's] meaning." *Id.*[3] Compare, however, the dissent of Holmes, J. (in which Morton and Barker, JJ., joined), *id.* at 299, 303: "Of course it does not matter that the defendant did not intend to injure the plaintiff, if that was the manifest tendency of his words."

Two points need be made about *Hanson*. First, *Hanson* bears close scrutiny today from the twin perspectives of tort law and constitutional law. Written nearly 100 years ago, it represents

---

[3] Notwithstanding this strong language in favor of a purely subjective inquiry into the defendant's state of mind, the court posited a number of "questions" to ascertain the defendant's meaning which necessarily were objective in nature. The court stated that the speaker's meaning may "legitimately be ascertained . . . from the language used . . . the circumstances under which it was written and the facts to which it relates . . . *so far as they can readily be ascertained by those who read the words,* and who attempt to find out the meaning of the author in regard to the person of whom they were written" (emphasis supplied). *Id.* The court also stated that it "may be doubtful" whether the defendant "should ever be permitted to state his undisclosed intention in regard to the person of whom the words are used." *Id.* at 297.

Moreover, the court also stated that if a defendant's language was "free from ambiguity in regard to the person referred to, and points clearly to a well known person, it would be held to have been published concerning that person, although the defendant should show that through some mistake of fact, not easily discoverable by the public, he had designated in his publication a person other than the one whom he intended to designate." *Id.* at 296. Thus, at some point — when the words unambiguously referred to a person not intended (and thus, presumably did not refer to the person intended) — the purely subjective inquiry could be replaced by a purely objective inquiry. For if the words were "free from ambiguity, the defendant [might] not be permitted to show that through ignorance or mistake he said something, either by way of designating the person, or making assertions about him, different from that which he intended to say." *Id.* at 296-297.

an historical view of tort law largely rejected by later cases, see *infra* at 447-480, and it fails to accommodate the profound changes in defamation law brought about by *New York Times Co.* v. *Sullivan, supra,* and *Gertz* v. *Robert Welch, Inc.,* 418 U.S. 323 (1974). Second, the issue of negligent defamation of an entity in the position of NETTT-Conn was not before the court. *Hanson, supra* at 299.

We believe that a purely subjective test for determining whether a defendant's words are of and concerning the plaintiff represents an outmoded historical conception of tort law. See 2 F. Harper & F. James, Torts § 16.2 (1956). As stated by Justice Holmes, an awkward person's "slips are not less trouble-some to his neighbors than if they sprang from guilty neglect." O.W. Holmes, Jr., The Common Law 108 (1881). Tort law generally deems those injured by a person's unintentional slips deserving of compensation if the slips could have been avoided through the use of ordinary care.

A purely subjective test for determining whether a defendant's words are of and concerning the plaintiff unduly narrows the potential for liability in defamation cases and leaves deserving plaintiffs uncompensated. In determining the proper test, however, we affirm the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *New York Times Co.* v. *Sullivan, supra* at 270, and the constitutional rule which follows that courts may not impose liability without fault in defamation cases. *Gertz* v. *Robert Welch, Inc., supra* at 347. In *Gertz,* the Supreme Court of the United States held that "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a pub-lisher or broadcaster of defamatory falsehood injurious to a private individual." *Id.* In *Stone* v. *Essex County Newspapers, Inc.,* 367 Mass. 849, 855 (1975), we resolved the conflict between the "right of redress to one who suffers injury to his reputation by the publishing of a defamatory falsehood" and the "freedom of expression . . . guaranteed by the First Amend-ment," by holding that "private persons . . . may recover com-pensation on proof of *negligent* publication of a defamatory

falsehood" (emphasis in original). *Id.* at 858. In the present case, we similarly hold that private persons or entities may recover compensation (assuming proof of all other elements of a claim for defamation) on proof that the defendant was negligent in publishing defamatory words which reasonably could be interpreted to refer to the plaintiff.[4]

To the extent that *Hanson* requires proof that the alleged defamatory matter was of and concerning the plaintiff, we adhere to that rule. However, to the extent that *Hanson* appears to require a plaintiff to prove that the defendant actually intended to refer to the plaintiff before liability may attach, we

---

[4] We assume that NETTT-Conn is a private entity, since no argument has been made to the contrary. See *Stone* v. *Essex County Newspapers, Inc., supra* at 858.

We note that the United States Supreme Court recently, in a plurality opinion, has cast some doubt on an aspect of the holding in *Gertz* v. *Robert Welch, Inc.,* 418 U.S. 323 (1974). In *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, Inc.,* 472 U.S. 749 (1985) (plurality opinion, Burger, C.J., and White, J., concurring in the judgment), five Justices appear to take the view that private parties need not prove actual malice in order to recover presumed or punitive damages if the libelous matter is not one "of public concern," *id.* at 757 (plurality opinion), "of general public importance," *id.* at 764 (Burger, C.J., concurring in the judgment), or "of public importance," *id.* at 772 (White, J., concurring in the judgment). The rationale of the plurality opinion was that "speech on matters of purely private concern is of less First Amendment concern." *Id.* at 759 (plurality opinion). Justice White's concurrence, in which he indicates his preference that *Gertz* be overruled, states that the *Gertz* requirement that private parties prove "some kind of fault on the part of the defendant," *id.* at 774, also is inapplicable to private parties suing on matters of private concern. Justice White alone states this proposition, however, and we do not interpret the plurality opinion, with its two concurrences in the judgment, to so alter the *Gertz* holding. We do not decide whether the matters discussed in the Globe articles touched on matters of public concern. We view the fault requirement of *Gertz* to be intact regardless whether the private parties are suing on matters of public or private concern. In any case, we base our holding in the present case — that a private plaintiff must prove that the defendant was negligent in publishing defamatory words which reasonably could be interpreted to refer to the plaintiff — on our own common law. "Most liabilities in tort . . . are founded on the infliction of harm which the defendant had a reasonable opportunity to avoid at the time of the acts or omissions which were its proximate cause." O.W. Holmes, Jr., The Common Law 145 (1881). The failure to take care when there is a reasonable opportunity to do so — i.e., fault — is the cornerstone of much of our tort law.

decline to follow it. Rather, we adopt the view that "[t]he question is not so much who was aimed at, as who was hit," *Corrigan* v. *Bobbs-Merrill Co.*, 228 N.Y. 58, 63-64 (1920), with one all-important proviso. While the plaintiff need not prove that the defendant "aimed" at the plaintiff, he or she must prove that the defendant was negligent in writing or saying words which reasonably could be understood to "hit" the plaintiff. *Davis* v. *R.K.O. Radio Pictures, Inc.*, 191 F.2d 901, 904 (8th Cir. 1951) ("The issue [is] whether persons who knew or knew of the plaintiff could *reasonably* have understood the exhibited picture to refer to him" [emphasis in original]) *Bee Publications, Inc.* v. *Cheektowaga Times, Inc.*, 107 A.D.2d 382, 385 (N.Y. 1985) ("[W]here extrinsic facts are relied on to prove the reference to a plaintiff, he must show that the conclusion that the publication refers to him is reasonable and that the extrinsic facts upon which that conclusion is based were known to those who read or heard the publication"). See also Restatement (Second) of Torts § 564, at 165 (1977) ("A defamatory communication is made concerning the person to whom its recipient correctly, or mistakenly but reasonably, understands that it was intended to refer");[5] W. Prosser &

---

[5] Restatement (Second) of Torts § 564 comment b (1977) states: *"Person mistakenly but reasonably believed to be intended.* If the communication is reasonably understood by the person to whom it is made as intended to refer to the plaintiff, it is not decisive that the defamer did not intend to refer to him. . . . It is not enough however, that the defamatory matter is actually understood as intended to refer to the plaintiff; the interpretation must be reasonable in the light of all the circumstances. It is not necessary that the plaintiff be designated by name; it is enough that there is such a description of or reference to him that those who hear or read reasonably understand the plaintiff to be the person intended. Extrinsic facts may make it clear that a statement refers to a particular individual although the language used appears to defame nobody. . . . It is not necessary that everyone recognize the other as the person intended; it is enough that any recipient of the communication reasonably so understands it. However, the fact that only one person believes that the plaintiff was referred to is an important factor in determining the reasonableness of his belief. If the applicability of the defamatory matter to the plaintiff depends upon extrinsic circumstances, it must appear that some person who saw or read it was familiar with the circumstances and reasonably believed that it referred to the plaintiff." (Emphasis in original.)

Comment f states: "[T]he defamer is subject to liability if he knew that the communication would be understood by the recipient to refer to the plain-

395 Mass. 471                                              479

New England Tractor-Trailer Training of Connecticut, Inc. v. Globe Newspaper Co.

W. Keeton, Torts § 111, at 783 (5th ed. 1984) ("the understanding that the plaintiff is meant must be a reasonable one"); *id.* § 113, at 808-810 (discussing whether plaintiff must prove that defendant was negligent in publishing words which reasonably could be interpreted to refer to the plaintiff).

It is arguable that our later opinions have already moved away from the *Hanson* subjective test and have adopted this rule of negligent defamation. See, e.g., *Merrill* v. *Post Publishing Co.,* 197 Mass. 185, 192 (1908); *Ingalls* v. *Hastings & Sons Publishing Co.,* 304 Mass. 31, 33-34 (1939); *Brauer* v. *Globe Newspaper Co.,* 351 Mass. 53, 55-56 (1966). In any event, we take this opportunity to make clear that a plaintiff may establish that the defendant's words were of and concerning the plaintiff by proving at least that the defendant was negligent in publishing words which reasonably could be interpreted to refer to the plaintiff. This position brings the proof of this aspect of a defamation claim into line with the proof of other aspects of a defamation claim: "As to defamatory impact, the issue is whether in the circumstances of this case a reasonably prudent person, writing an article for publication, would realize that attribution of the racial reference [to the plaintiff] would discredit the plaintiff in the minds of a 'considerable and respectable segment in the community.'" *Schrottman* v. *Barnicle,* 386 Mass. 627, 641 (1982), quoting *Stone* v. *Essex County Newspapers, Inc., supra* at 853. Also, in determining whether an allegedly defamatory statement is fact or opinion, "the test is whether the challenged language can reasonably be read as stating a fact." *Myers* v. *Boston Magazine Co.,* 380 Mass. 336, 340 (1980). Moreover, an ob-

---

tiff or was negligent in failing to recognize that this might happen. If the recipient reasonably understood the communication to be made concerning the plaintiff, it may be inferred that the defamer was negligent in failing to realize that the communication would be so understood. . . . *It is . . . necessary for the plaintiff to prove that a reasonable understanding on the part of the recipient that the communication referred to the plaintiff was one that the defamer was negligent in failing to anticipate.* This is particularly important when the recipient knew of extrinsic facts that make the communication defamatory of the plaintiff but these facts were not known to the defamer." (Emphasis supplied.) *Id.*

jective test — i.e., inquiry into a reasonable recipient's understanding of the words rather than the speaker's intent — has been used over the years to prove that words are defamatory. *Rue* v. *Mitchell*, 2 U.S. (2 Dall.) 58, 59 (1790) ("The sense in which words are received by the world, is the sense which Courts of Justice ought to ascribe to them, on the trial of actions for slander"). *Washington Post Co.* v. *Chaloner*, 250 U.S. 290, 293 (1919), quoting *Commercial Publishing Co.* v. *Smith*, 149 F. 704, 706-707 (6th Cir. 1907) ("A publication claimed to be defamatory must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it").

In holding that a plaintiff must prove that a defendant negligently wrote and published words which reasonably could be interpreted to refer to the plaintiff, we in no way depart from the rule that the plaintiff may plead and prove extrinsic facts tending to show that the words could be so interpreted. "[I]f the person is not referred to by name or in such manner as to be readily identifiable from the descriptive matter in the publication, extrinsic facts must be alleged and proved showing that a third person other than the person libeled understood it to refer to him." *Brauer* v. *Globe Newspaper Co., supra* at 56.

While we favor the use of summary judgment procedures in defamation cases, see *Cefalu* v. *Globe Newspaper Co.*, 8 Mass. App. Ct. 71, 74 (1979), appeal dismissed and cert. denied, 444 U.S. 1060 (1980), we hold in this case that the trial judge erred in granting summary judgment for the Globe. The affidavits presented several genuine issues of material fact relating to the question whether the Globe articles were of and concerning NETTT-Conn. These issues are (1) whether the Globe intended to refer to NETTT-Conn and was so understood, and (2) if it did not so intend, whether it was negligent in publishing articles which reasonably could be understood to refer to NETTT-Conn.

The Globe filed an affidavit of the principal reporter in charge of investigating and writing the articles in issue. In his affidavit, the reporter states that he researched only NETTT-Mass, and that he did not intend to refer to NETTT-Conn. This

affidavit is not conclusive on the question of the Globe's intent. To rebut this claim NETTT-Conn filed two affidavits of Arlan Greenberg, president of both NETTT-Conn and NETTT-Mass, the second of which stated that Greenberg had explained to the Globe reporter that "[t]he New England Tractor-Trailer Training School is one school with a branch in Quincy, Massachusetts and a branch in Somers, Connecticut." NETTT-Conn argues that the Globe intended to refer to NETTT-Conn as well as to NETTT-Mass. Despite the reporter's assertions, we conclude that it is an unresolved question of fact whether the Globe actually intended to refer to NETTT-Mass and NETTT-Conn, or simply to NETTT-Mass.

Moreover, even if a fact finder should conclude that the Globe did not intend to refer to NETTT-Conn, there is a material issue of fact as to whether the Globe was negligent in publishing articles which reasonably could be interpreted to refer to NETTT-Conn. This issue breaks into two distinct components. The first is whether the Globe articles reasonably could be interpreted to refer to NETTT-Conn. The second is, if the articles reasonably could be so understood, whether the Globe was negligent in publishing them. Of course, "[i]f the recipient reasonably understood the communication to be made concerning the plaintiff, it may be inferred that the defamer was negligent in failing to realize that the communication would be so understood. . . . [However,] [i]t is . . . necessary for the plaintiff to prove that a reasonable understanding on the part of the recipient that the communication referred to the plaintiff was one that the defamer was negligent in failing to anticipate." Restatement (Second) of Torts § 564 comment f. See *supra* note 5.

The Globe articles published on March 29, April 12, and June 6, 1974, referred to "New England Tractor-Trailer School." The March 29, 1974, article begins, "On a windswept abandoned air strip in Quincy, [Massachusetts,] dozens of young men sit in their cars for hours each day awaiting their turns to drive run-down tractor trailers." The Globe argues that this initial reference to Quincy, Massachusetts, makes it clear that this article (and the April 12 and June 6 articles which

refer back to this article) refers only to NETTT-Mass. We do not agree. We believe that it is a question of fact whether the article reasonably could be understood as referring to NETTT-Conn as well as to NETTT-Mass. Nowhere does the article specifically state that it describes NETTT-Mass. Also, no explicit reference to NETTT-Conn is made. Numerous statements in the article could be construed as describing a regional school. The school is referred to as "New England." The article alleges that New England violated the laws "of at least two states," Massachusetts and New Hampshire. It stated that "New England . . . calls itself the largest such school in the region." *Id.* Moreover, it quoted statements of Arlan Greenberg, whom it described as "N.E. Tractor president"; Greenberg's affidavits state that he is the president of both NETTT-Conn and NETTT-Mass.

If a jury were to find that the Globe articles reasonably could be interpreted to refer to NETTT-Conn, it would then be presented with another issue of material fact: Whether the Globe was negligent in writing and publishing articles which could be so interpreted. Pertinent to this issue are the questions whether NETTT-Mass and NETTT-Conn hold themselves out to be one school with two locations; if so, whether the Globe knew, or reasonably should have known, that they did so. NETTT-Conn has submitted evidence from which a jury could infer that NETTT-Conn and NETTT-Mass held themselves out to the public as one school, and that the Globe knew, or reasonably should have known, this fact. Appended to the first Greenberg affidavit are numerous pieces of literature describing and advertising the school. In many instances the brochures refer simply to "New England Tractor Trailer Training, Inc.," and provide two sets of addresses and telephone numbers, one in Connecticut and one in Massachusetts. A company letterhead and an announcement both refer to "New England Tractor Trailer Training of Connecticut, Inc.," but give addresses and telephone numbers in Connecticut and Massachusetts. Moreover, the Globe reporter's affidavit states that he applied for admission to NETTT-Mass; a jury could infer that he received brochures from NETTT-Mass which indicated the ex-

istence of NETTT-Conn. The reporter's affidavit does not disavow knowledge of the existence of NETTT-Conn. Greenberg, in his second affidavit, states that he told the Globe reporter that the school had two separate corporate identities but that "[e]ach corporation held itself out as, and has been known as part of, the same school." The plaintiffs also submitted an affidavit showing that these articles, and the Globe, were published in Connecticut.

In conclusion, we hold that a defamation plaintiff must prove that the defendant's words are of and concerning the plaintiff. To do so, the plaintiff must prove either that the defendant intended its words to refer to the plaintiff and that they were so understood, *or* that the defendant's words reasonably could be interpreted to refer to the plaintiff and that the defendant was negligent in publishing them in such a way that they could be so understood. NETTT-Conn has raised genuine issues of material fact which preclude the entry of summary judgment for the Globe.

*Judgment reversed.*